**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALBERT P. O'DONNELL,** | : |
| **REBECCA M. O'BRIEN, and** | : **CIVIL ACTION NO. 3:20-CV-225** |
| **GEORGE GEVARAS, and DYLAN** | : **(JUDGE MARIANI)** |
| **McGOFF on behalf of themselves** | : |
| **and all others similarly situated,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **SCRANTON SCHOOL DISTRICT,** | : |
| | : |
| **Defendant.** | : |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Defendant's Motion to Dismiss the Amended Class Action Complaint ("Amended Complaint") (Doc. 40) is pending before the Court. With the Motion, Defendant asks the Court to dismiss Plaintiffs' Amended Class Action Complaint (Doc. 35) with prejudice. (Doc. 41 at 2.)

The four named Plaintiffs in the Amended Complaint are Albert O'Donnell, principal of a Scranton School District elementary school, Rebecca O'Brien, a reading specialist in a Scranton School District middle school, George Gevaras, a former maintenance worker at numerous Scranton School District schools, and Dylan McGoff, a former student who attended schools within the Scranton School District. (Doc. 35 ¶¶ 8-11.) Defendant is the Scranton School District ("District"). (*Id.* ¶ 12.)

Plaintiffs' Amended Complaint (Doc. 35) alleges similar claims to those raised in their original Complaint (Doc. 1) but includes additional allegations of acts of concealment and misrepresentation by District officials. This action is based on Plaintiffs' claims that the District has numerous confirmed instances of asbestos contamination and lead in the drinking water in its schools, and the District was made aware of these problems and concealed these issues from the public. (*See* Doc. 35.) Plaintiffs' Amended Complaint, filed on August 15, 2022, contains three counts: Count I asserts a State-Created Danger claim pursuant to 42 U.S.C. §§ 1983 and 1988; Count II asserts a Fourteenth Amendment Substantive Due Process Bodily Integrity claim pursuant to 42 U.S.C. § 1983; and Count III asserts a Pennsylvania common law medical monitoring claim. (*Id*. at 53, 55, 56.)

For the reasons explained below, the Court will dismiss Plaintiffs' state-created danger and substantive due process bodily integrity claims with prejudice. The Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law medical monitoring claim to allow for Plaintiffs to file that claim in state court.

## II. Background[1]

Plaintiffs are current or former District employees and students. (Doc. 35 ¶¶ 8-11.) Defendant is the District. (*Id*. ¶ 12.) At all relevant times, the District owned, possessed, and

---

[1] Unless otherwise noted, the background information reiterates facts contained in Plaintiffs' Amended Complaint (Doc. 35).

controlled the schools subject to reports of the presence of asbestos and lead in District buildings. (*Id.* ¶ 17.)

At the end of January 2020, District officials first revealed widespread asbestos and lead issues affecting most of the Schools in the District. (*Id*. ¶ 23.) During the week of January 27, 2020, the District closed four Schools (Northeast Intermediate, Prescott Elementary, Willard Elementary, and Robert Morris Elementary) due to the presence of airborne asbestos and lead in the drinking water. (*Id*. ¶ 23.)

## Lead

Lead can enter drinking water when plumbing materials that contain lead corrode, especially where the water has high acidity or low mineral content that corrodes pipes and fixtures. (Doc. 35 ¶ 25.)

> The most common sources of lead in drinking water are lead pipes, faucets, and fixtures.  Lead pipes are more likely to be found in older cities and buildings built before 1986. Among properties without lead service lines, the most common problem is with brass or chrome-plated brass faucets and plumbing with lead solder.

(*Id.*)

The EPA has set the maximum contaminant level goal for lead in drinking water at zero because lead is a toxic metal that can be harmful to human health even at low exposure levels. (*Id.* ¶ 26.) Lead affects different groups of people in different ways:

> 27. Young children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure

levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. As a result, the EPA considers lead as "the most serious environmental health hazard for children under 6 years old in the United States."

28. Low levels of lead exposure in children have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells. According to the EPA, even low levels of lead in the blood of children can result in behavior and learning problems, lower IQ, hyperactivity, slowed growth, hearing problems, and anemia.

29. In rare cases, ingestion of lead can cause seizures, coma, and even death. Studies have further shown that there is no safe level of lead in children's blood and, if too much lead is ingested from drinking water, the result can be serious health problems including brain damage, kidney damage, and interference with the production of red blood cells that carry oxygen to parts of the body. Early intervention is crucial, because the effects of lead are cumulative: the longer the child is exposed, the more serious the danger.

30. Lead can accumulate in human bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium and is used to help form the bones of the fetus. This is particularly true if a woman does not have enough dietary calcium. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including reduced growth of the fetus and premature birth. Lead can also be transmitted to infants through breast milk.

31. For adults, generally, lead exposure can cause cardiovascular effects, increased blood pressure and incidence of hypertension; decreased kidney function; and reproductive problems (in both men and women).

(Doc. 35 ¶¶ 27-31.)

On March 29, 2016, a member of the local media sent an e-mail to Susan McGregor,

then-Community Relations Director for the Defendant, then-Superintendent Alexis Kirijan,

and a former board member of the Defendant, inquiring as to what, if any, lead testing the Defendant had done to protect the students from exposure to lead in the water. (*Id*. ¶ 34.) Emails reflect that, on the following day, March 30, 2016, McGregor responded to the media inquiry that Kirijan handled all press contacts and responses. (*Id*. ¶ 35.) McGregor further responded that the Chief Operations Officer Jeff Brazil was the appropriate person to address the media inquiry and she would forward the email to him. (*Id*.)

In response to the March 2016 press inquiry, and with input from at least one member of the District School Board, the Defendant entered a contract with an environmental consultant, Guzek Associates, Inc. ("Guzek") to have all the drinking water outlets in the District tested for lead. (*Id*. ¶ 36.) At the time this action was taken in 2016, school districts in the Commonwealth of Pennsylvania were not legally obligated to conduct such testing, thus, Defendant voluntarily initiated this testing. (Doc. 35 ¶ 37.)

The Spring 2016 Guzek testing revealed that over one-third of the water sources tested contained the presence of lead. (*Id*. ¶ 38.) At least 22 water sources (fountains and/or sinks) either met or tested above the EPA "action trigger level" —.015 mg/l—thereby requiring remediation. (*Id*. ¶ 39.) The testing also confirmed that the water entering District buildings, which was provided by the Scranton Water Department, contained no discernible levels of lead, meaning that the source of the lead contamination must have been from the Defendant's building pipes. (*Id*. ¶ 40.)

Internal District records reflect that after these 2016 test results, the Defendant claimed to have taken 19 of the 22 water sources out of operation. (*Id*. ¶ 41.) Regarding the other 3 water sources, internal District records indicate that the Defendant declined to disconnect two water fountains at Whittier Elementary, claiming that the building used bottled water and therefore no action was necessary. (Doc. 35) Similarly, although it was recommended that a kitchen sink at Willard Elementary be disconnected, internal reports reflected that the Defendant took no action on that sink. (*Id*.) 10 of the water sources that Guzek recommended the Defendant deactivate in 2016 were still operational in 2018. (*Id*.) The Defendant's records reflect that water sources were not deactivated following Guzek's directive to disconnect them. (*Id*.) In 2018, Guzek conducted additional testing and discovered that 7 water sources they recommended for deactivation in 2016 were still operational. All 7 of those sources tested positive for the presence of lead. (*Id*. ¶ 42.)

On June 8, 2016, after receiving the results of the 2016 Guzek testing, Kirijan and Brazil hosted a press conference to announce that they had effectively addressed all lead concerns throughout the District. (Doc. 35 ¶ 43.) The Scranton Times also published the following story on June 8, 2016, prior to the District's press conference, titled "SCRANTON SCHOOL DISTRICT: WATER TESTED, ALL IS OK":

> Water testing done by the Scranton School District reveals that children are not in any danger, according to the district's superintendent and school board president. The district began testing the water in all of its buildings for lead this spring. Officials decided to hire Guzek Associates of Clarks Summit after news

6

of the water contamination in Flint, Michigan, and questions about the safety of water locally. The district will release those results at a 2 p.m. press conference today. Results will be available at the district's website, scrsd.org, after the announcement. While students were not in any danger, district officials said they will also discuss several remedial measures put in place. For example, a water fountain at West Scranton High School was shut down because of old fittings that resulted in elevated lead levels from that one source, board President Bob Sheridan said.

(*Id*. ¶ 44.)

In an August 2, 2018, e-mail to Defendant, a Pennsylvania senator attached the 2018 Amendments to the 1949 Public School Code (24 PA. STAT. § 7-742) and informed Defendant that the Commonwealth now required "testing for the presence of lead in school drinking water." (*Id*. ¶ 52.) The Senator further highlighted the relevant portions of § 7-742 and offered to answer any questions Defendant had concerning the amendments. (*Id*.) Defendant, via then-Superintendent Kirijan, received additional correspondence two months later, in which she was again informed of the 2018 amendments. (*Id*. ¶ 53.) By e-mail dated November 16, 2018, the Senator's Executive Assistant informed Kirijan that the Senator wanted to advise her that "the lead testing requirements for the Department of Education [had] been posted." (*Id*.) The Executive Assistant also directed Kirijan to familiarize herself with the new law and provided an e-mail link to the Department of Education's website concerning compliance with the new law. (*Id*.) Subsequently, Brazil contracted with Guzek for another complete round of lead testing in 2018. (Doc. 35 ¶ 54.)

**December 2018 Lead Testing**

In December of 2018, Guzek performed lead contamination tests in all fountains and sinks that provided water for drinking and/or food preparation throughout the District. (*Id*. ¶ 55.) These water sources were in hallways, classrooms, and cafeterias throughout the District. (*Id*.) Of the 303 water sources tested, Guzek informed the Defendant that nearly half of them contained measurable amounts of lead. (*Id*.) More specifically, the test results revealed that at least 28 water sources throughout the District tested above both the EPA's remediation trigger level and the action level established by the Pennsylvania Department of Environmental Protection. (*Id*. ¶ 56.)

The testing also confirmed that the water provided by the Scranton Water Department that was entering the District buildings contained no discernible levels of lead, indicating that the lead was being introduced into the water after entering the District's system. (Doc. 35 ¶ 57.) Commencing in January of 2019, Guzek sent the December 2018 test results via e-mail and regular mail to Brazil who, in turn, forwarded them to the District's Superintendent. (*Id.* ¶ 58.) Beginning on January 3, 2019, Brazil began receiving results of the Guzek testing throughout the District. (*Id.* ¶ 59.) Specifically, Brazil received several e-mails from Guzek in January of 2019. (*Id*.) In those e-mails, Guzek identified multiple sink and fountain areas in various District schools that exceeded the EPA Remediation Trigger Level and recommended shutting these areas off immediately. (*Id*.)

E-mails in February 2019 indicate that Guzek provided Defendant with additional water testing results and reports for schools and facilities in the District. (*Id*. ¶ 60.) In those e-mails, Guzek identified additional areas in the District exceeding "the EPA remediation Trigger Level" and recommended that those areas be disconnected immediately. (Doc. 35.) In a February 20, 2019, e-mail, Guzek furnished the Defendant with a copy of the EPA's 73-page manual entitled: "3 T's for Reducing Lead in Drinking Water in Schools and Child Care Facilities: A Training, Testing, and Taking Action Approach." (*Id*. ¶ 61.) Finally, on March 4, 2019, Guzek provided Defendant with its 10-page "final list" of test results for all the water sources in the District schools, emphasizing those areas which contained dangerous levels of lead. (*Id*. ¶ 62.)

There were five facilities where there were water sources that Defendant had been told to disconnect in 2016 and which their internal records indicated had been disconnected but were not disconnected as of 2018. (*Id*. ¶ 63.) Seven of the ten water sources (sinks/fountains) identified by Guzek in 2016 testing—that the District never deactivated despite being directed to do so—were retested by Guzek in 2018 after Guzek technicians discovered that they were still operational. (*Id*. ¶ 64.) All seven were found to contain lead. (*Id*.)

Over half of the sources tested by Guzek showed contamination with lead. (Doc. 35 ¶ 65.) Five of those seven water sources tested above both the EPA's remediation trigger

level and the action level. (*Id*.) Most of the 28 sources listed above were at least two times

higher than the .015 mg/L immediate action level; several were 50 or 100 times higher. (*Id*.)

Although these 28 sources were the most egregious, over half of the sources tested showed

some level of contamination with lead. (*Id*.)

Brazil forwarded the January 2019 e-mails containing the Guzek lead test results to

Kirijan. (*Id*. ¶ 66.) Kirijan, by e-mail dated January 5, 2019, inquired about whether all the

schools had been tested. (Doc. 35.) Brazil responded that all the schools had been tested

but not all results were back yet. (*Id*.) Kirijan later advised Brazil that she would report "all to

the Board" at the meeting later that month, but she did not do so. (*Id*.) Additionally, on

January 15, 2019, Brazil forwarded to Kirijan the e-mail and test results he received from

Guzek earlier that day which identified five additional school sinks and fountains at three

additional District schools that exceeded the EPA's Remediation Trigger Level. (*Id*. ¶ 67.)

Only two of the seven water sources tested were lower when retested in 2018. (*Id*.)

The three water sources identified in the 2016 testing that were not retested by

Guzek in 2018 were those in which internal District records reflected that no further action

was necessary. (Doc. 35 ¶ 68.) However, Defendant did not take any action to disconnect

these water sources in 2016 or after. (*Id*.) The District's records were not accurate. (*Id*.)

On January 15, 2019, Kirijan asked Brazil whether the entire District had been tested

and whether the forwarded test results represented the "entire list" of District areas which

exceeded EPA levels. (*Id*. ¶ 69.) Despite being advised in January 2019 of the hazardous lead test results, Kirijan took no action to remove, disconnect or remediate those lead-contaminated water sources, or to ensure that the work had been done. (*Id*. ¶ 70.) The Defendant did not ensure that any of these contaminated sources were disconnected, and Plaintiffs allege that Defendant instead concealed the results and failed to warn students, faculty members, staff members, and parents about those high lead test results. (Doc. 35 ¶ 71.) Plaintiffs contend that many students, faculty, and staff members had already ingested the contaminated water, with cumulative dangerous effects, but were not told. (*Id*. ¶ 72.) Rather, Defendant advised them that "All is OK" in its 2016 statements to the Scranton Times. (*Id*.)

As part of her criminal investigation, a folder from Kirijan's file cabinet was recovered, which contained a list of topics that Kirijan considered presenting to the District School Board Executive Committee on January 26, 2019. (*Id*. ¶ 73.) One of the topics was the 2018 Guzek lead test results. (*Id*.) Included with that list of topics was a folder containing 13 separate copies of the 2018 test results. (Doc. 35.) This number of copies correlated to the number of board members, including board secretary and solicitor, who would be attending the upcoming meeting. (*Id*.) However, Kirijan did not disclose the information pertaining to the 2018 test results to the board members. (*Id*.) Indeed, it was not until January of 2020 that the lead test results were brought to the attention of the new

administration and those water sources were immediately disconnected and the problem

was disclosed. (*Id*. ¶ 74.) Kirijan never forwarded the lead test results to the Pennsylvania

Department of Education. (*Id*. ¶ 75.)

<u>**Asbestos**</u>

Asbestos is considered an excellent electrical insulator due to its high resistance to

fire, heat, electrical, and chemical damage, but it is a highly toxic airborne fibrous substance

that has been identified as a major carcinogen to those exposed to it. (*Id*. ¶ 84.) There are

two general ways that asbestos becomes airborne:

> 87. […] Products manufactured with asbestos can age, deteriorate or biodegrade over time. As asbestos crumbles with age, it can collapse and leave light dust of asbestos fibers surrounding it causing a natural disturbance. These fibers can be lifted on any slight draft or ventilation action and inhaled. Other natural forces like air friction can fray asbestos in pipe insulation, or direct contact with pests, like mice or rats, can tear into the material and expose the fibers.

> 88. Manufacture, transport, installation and — more recently — the destruction of materials containing asbestos has become a primary cause for asbestos to be injected into the air. Demolition and renovation pose the most critical threat as workers unknowingly cut into workspaces or materials containing asbestos without the proper hazard gear. Natural winds and ventilation systems used in the buildings while work is ongoing create exposure risk for disturbed and airborne asbestos fibers, causing them to be inhaled by a wider group than those who directly contacted the material.

> 89. Inhalation of asbestos particles occurs when asbestos-containing materials decompose or are physically disturbed.

(Doc. 35 ¶¶ 87-89.)

In 1970, Congress passed the Clean Air Act, which allowed the Environmental

Protection Agency to regulate asbestos as a hazardous air pollutant. (*Id.* ¶ 86.) The EPA

has designated asbestos as a Group A carcinogen. (*Id.*) The Mayo Clinic has indicated that

the "effects of long-term exposure to asbestos typically don't show until 10 to 40 years after

initial exposure [and] [s]ymptoms can vary in severity." (*Id.* ¶ 94.) Federal law and

Environmental Protection Agency regulations require the District to inspect its Schools for

asbestos-containing building material, prepare management plans, and take action to

prevent or reduce asbestos hazards. (*Id.* ¶ 96.)

Guzek's 2016 inspection and 2019 comprehensive reinspection for asbestos

identified widespread asbestos problems in various Schools in the District. (*Id.* ¶¶ 111-113.)

The 2016 asbestos testing revealed approximately 74 locations within District buildings that

were near the highest levels of danger: Level 2 and Level 3 "Removal Priority," which

require urgent action for remediation. (*Id.* ¶ 111.) Specifically, there were 28 locations

identified as a Level 2 "Removal Priority," and 46 locations identified as a Level 3 "Removal

Priority." (*Id.*) These areas included classrooms and restrooms, and a cafeteria, regularly

used by children and teachers. (*Id.*) Guzek's testing showed that between the 2016

inspection and the 2019 re-inspection, 15 of the 74 areas containing ACBM became even

worse. (*Id.* ¶ 112.) Additionally, 42 of the 74 areas retained the same urgent "Removal

Priority" levels, demonstrating that the District had taken no action to remediate those areas.

(*Id.*) Of the 74 locations originally designated as urgent "Removal Priority" levels, only 7 had confirmed abatement projects completed between 2016 and 2019. (*Id*. ¶ 113.)

## Class Action Allegations

In their Amended Complaint, Plaintiffs allege that Defendant knowingly allowed the presence of asbestos and lead in unsafe levels within the Schools for an extended period and did not do anything to properly correct the problems or notify students, parents, employees, and independent contractors of the presence of asbestos and lead in unsafe levels until January 2020. (*Id.* ¶¶ 120, 121.) Additionally, unlike the allegations contained within their original Complaint, the Amended Complaint adds various claims of concealment, misrepresentation, and false assurances on the part of senior administrators working for the District. (*Id*.) Plaintiffs bring their amended claims as a class action pursuant to Rule 23(a), (b)(1), (b)(2) and (b)(3) on behalf of the class defined as follows:

> All students, teachers and staff who attended and/or worked in any of the 16 Schools and/or Administrative Building identified to have the presence of lead in the drinking water and asbestos between January 1, 2016, and January 27, 2020.

> Excluded from the Class are those who have already manifested a disease as a result of exposure to asbestos or lead.

(*Id.* ¶ 132.)

14

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S.

at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.,* 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal,* 556 U.S. 679).

The Third Circuit Court of Appeals has identified the following three-step inquiry as appropriate to determine the sufficiency of a complaint pursuant to *Twombly* and *Iqbal:*

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Burch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011); *see also Connelly v. Steel Valley Sch. Dist.,* 706 F.3d 209, 212 (3d Cir. 2013); *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir.2010).

In considering a motion to dismiss, the reviewing court examines

the "complaint, exhibits attached to the complaint, [and] matters of public record," *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), we can also consider documents "that a defendant attaches as an exhibit to a motion to dismiss," *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), if they are "undisputedly authentic" and "the [plaintiff's] claims are based [on them]," *Mayer*, 605 F.3d at 230. That holding extends to settlement material because plaintiffs "need not provide admissible proof at th[e] [motion-to-dismiss] stage." *In re OSG Sec. Litig.*, 12 F. Supp.3d 619, 622 (S.D.N.Y. 2014); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp.3d 936, 961 n.5 (N.D. Cal. 2014) (same). Moreover, the Supreme Court has been clear about the scope of our review, stating we "*must* consider the complaint in its entirety, as well as other sources [we] ordinarily examine when ruling on ... motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis added).

*Estate of Roman v. City of Newark*, 914 F.3d 789, 796–97 (3d Cir.), *cert. denied sub nom. Estate of Roman v. City of Newark, New Jersey*, 140 S. Ct. 82, 205 L. Ed. 2d 28 (2019), and *cert. denied*, 140 S. Ct. 97, 205 L. Ed. 2d 28 (2019).

Even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

17

## IV. ANALYSIS

Defendant contends that the Court should dismiss Plaintiffs' Amended Complaint on numerous grounds: (1) Plaintiffs improperly seek to proceed against Defendant on a theory of *respondeat superior* liability for the alleged conduct of District employees Kirijan and Brazil; (2) Plaintiffs fail to state a claim under the theory of a state-created danger filed pursuant to 42 U.S.C. §§ 1983 and 1988; (3) Plaintiffs' Fourteenth Amendment Substantive Due Process Bodily Integrity claim filed pursuant to 42 U.S.C. § 1983 fails for the same reasons the state-created danger claim fails; and (4) Plaintiffs' medical monitoring claim is inadequately pled and the District is entitled to immunity from this claim. (*See* Doc. 41 at 6.)

Regarding Defendant's argument related to the conduct of Kirijan and Brazil, the Court notes that Plaintiffs do not rely on Brazil's conduct to support their claims, stating that information about him is included in their statement of facts for context only. (*See* Doc. 44 at 21 n.2.) Regarding Kirijan's conduct, for purposes of *respondeat superior* liability, the Court will assume *arguendo* that the District can be liable for her conduct pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).[2]

---

[2] Generally, plaintiffs may use 42 U.S.C. § 1983 as a vehicle to assert claims for violations of their constitutional rights by municipalities and other local government units, including public school districts. *See generally Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To establish liability via a policy, only officials with "final policymaking authority"—as defined by state law—may directly subject a school district to liability through their actions. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)). The Court looks to state law to determine who possesses final policymaking authority. *See Praprotnik*, 485 U.S. at 124. An official has final policymaking authority if "as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question" and if "the

official's authority to make policy in that area is *final* and *unreviewable*." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (internal citations omitted) (emphasis in original).

Here, Plaintiffs argue that (1) authority was delegated to Kirijan through Pennsylvania law and the School Board President ratified her conduct and that (2) in 2018 Pennsylvania law made Kirijan a policymaker with respect to reporting lead. (*See* Doc. 44 at 21 n.2.) Plaintiffs do not offer any facts to allege that Kirijan had final policymaking authority with respect to addressing asbestos concerns throughout the District. With respect to authority to address lead concerns in the District, Plaintiffs' reliance on 24 P.S. § 10-1006, § 7-742, and § 10-1081 is misplaced. Section 10-1006 only requires the Superintendent to furnish reports to the Secretary of Education as the Secretary "may request." Section 7-742 does not state *who* is responsible for reporting lead levels. Plaintiffs also reference § 10-1081, which permits school boards to assign to the superintendent any "such other duties as may be required by the board of school directors," but Plaintiffs fail to allege any facts in their Amended Complaint to suggest that the District's school board assigned duties to Kirijan with respect to addressing lead and asbestos issues in the District. Therefore, it is unlikely that Plaintiffs could plausibly allege that any of these sections of the Pennsylvania School Code granted Kirijan policymaking authority to oversee lead testing and the publicity of the results.

Plaintiffs' allegations likely did not sufficiently plead that Kirijan was delegated authority or had her acts ratified by the District. An employee who lacks policymaking authority can still bind the municipality if a municipal policymaker delegated power to the employee or ratified their decision. *See La Verdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003). Ratification occurs only "'when a subordinate's decision is subject to review by the municipality's authorized policymakers [because] they have retained the authority to measure the official's conduct for conformance with their policies.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010) (quoting *Praprotnik*, 485 U.S. at 127). "'Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.'" *Id.* (quoting *Praprotnik*, 485 U.S. at 130).

Here, it is unlikely that Plaintiffs have adequately pled that the District delegated policymaking authority to Kirijan to respond to lead and asbestos concerns in the District. None of the conclusory and minor circumstantial allegations made by Plaintiffs with respect to board members' involvement in Kirijan's conduct show that Kirijan was specifically delegated final and unreviewable policymaking authority. *See Hill*, 455 F.3d at 245. Plaintiffs' argument that Kirijan had policymaking authority because she was "the chief executive officer of the district" (Doc 35 ¶ 21) is outweighed by the requirement that Plaintiffs must show that authority was specifically delegated or that Kirijan's acts were ratified such that her acts were final and unreviewable. *See also Hill*, 455 F.3d at 245. The allegations of input from a member of the District's board (*id.* ¶ 36), the Board President's statements to the Scranton Times (*id.* ¶ 44) and the general statements of Kirijan's job functions (*id.* ¶ 20) are each insufficient to show that Kirijan had final and unreviewable policymaking authority pursuant to delegation or ratification. Therefore, the Court views Plaintiffs' allegations as being unlikely to have sufficiently alleged that Kirijan had policymaking authority or that her conduct should be imputed to the District.

**A. State-Created Danger Theory**

Defendant argues that dismissal is warranted with respect to Plaintiffs' state-created danger claim contained in their Amended Complaint (Doc. 35). (*See* Doc. 41 at 16.) Plaintiffs contend that they plead additional facts in their Amended Complaint that make out a state-created danger claim. (*See* Doc. 44 at 30.) The Court finds that Plaintiffs fail to adequately plead all the elements of a state-created danger claim.[3]

Explaining the basis of a state-created danger claim, the Third Circuit has stated that:

> the government has no general legal duty to keep people safe. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96, 109 S.Ct. 998, 103 L.Ed .2d 249 (1989). But it assumes one "when it affirmatively places [a] person in a position of danger [that] the person would not otherwise have faced." *Kamara v. Att'y Gen.*, 420 F.3d 202, 216 (3d Cir. 2005). Then, the government must protect people from the dangers it created. The Fourteenth Amendment's Due Process Clause requires it to do so. *Id.*

*Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022).

---

[3] Reviewing Plaintiffs' Amended Complaint to identify allegations that attempt to make out a state-created danger claim, the Court "disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm,* 707 F.3d at 231, n.14. Paragraphs 4, 37, 40, 45, 46-51, 86, 96-98, 107, 122, 129, 130, 144-146, and 148 of Plaintiffs' Amended Complaint are conclusory allegations that will be disregarded accordingly.

Similarly, the Court disregards allegations in the Amended Complaint containing factual assertions which are not material to the elements of a state-created danger claim. These allegations are paragraphs 2, 3, 33, 34, 35, 36, 37, 38, 39, 53, 54, 55, 56, 76-95, 100, 103, 104, 105, 106, 108-111, 114, 118, 119, 124, 125-128. While informing the Court as to the context in which the Plaintiffs bring suit, the allegations do not allege sufficient facts which, if proven, would state a cause of action under a theory of state-created danger.

*Mears* affirmed the pleading requirements of a state-created danger claim which

were set out in *Bright v. Westmoreland*, 443 F.3d 276 (3d Cir. 2006), as follows:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

443 F.3d at 281 (internal quotations marks omitted).

Analyzing a state-created danger claim in *Henry v. City of Erie*, 728 F.3d 275 (3d Cir.

2013), the Third Circuit cautioned against expansion of the state-created danger doctrine

after citing relevant Supreme Court precedent:

[t]he Supreme Court has counseled a restrained approach in the area of substantive due process. The Court has said that "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," and cautioned that courts must "exercise the utmost care whenever ... asked to break new ground in this field." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Heeding this advice, the *DeShaney* Court declined to expand its substantive due process jurisprudence even in the face of tragic circumstances, explaining that

[t]he people ... may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort

21

> law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

489 U.S. at 203, 109 S.Ct. 998. Again, in *County of Sacramento v. Lewis,* the Court said that substantive due process "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), and found that in cases dealing with executive action, our role is to guard against "only the most egregious official conduct," *id.* at 846, 118 S.Ct. 1708.

728 F.3d at 286.

## 1. Affirmative Use of Authority

Defendant contends that "[t]he most critical deficiency in Plaintiffs' claim is the fact that they do not, and cannot, allege any fact that could plausibly be construed as an affirmative action by Defendant, as opposed to either a mere failure to act, or an omission, that resulted in a departure from the status quo." (Doc. 41 at 18.) Plaintiffs argue that dismissal is not warranted because "the FAC contains numerous examples of the effort to conceal the facts from Plaintiffs and the putative Class." (Doc. 44 at 30.) The Court concludes that Plaintiffs fail to plead an affirmative act on the part of the District.

To adequately plead the fourth element of a state-created danger claim, the plaintiff must plausibly show that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright*, 443 F.3d at 281.

The Supreme Court has held that failures to act are not affirmative acts for the purposes of alleging a state-created danger claim:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see also, e.g., Morrow v. Balaski,* 719 F.3d 160, 178 (3d Cir. 2013), *as amended* (June 14, 2013).

In *Johnson v. City of Philadelphia*, 975 F.3d 394 (3d Cir. 2020), the Court of Appeals for the Third Circuit explained that it had previously

> noted the "inherent difficulty in drawing a line between an affirmative act and a failure to act," and sometimes frame the inquiry as asking whether a defendant's "exercise of authority resulted in a departure from th[e] status quo." [*L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242–43 (3d Cir. 2016). But we have repeatedly held that an alleged failure *to do something*, standing alone, cannot be the basis for a state-created danger claim. *See, e.g.*, *Burella v. City of Phila.*, 501 F.3d 134, 146–47 (3d Cir. 2007) (police officers' failure to intervene in domestic-violence situation did not satisfy element four).

*Johnson*, 975 F.3d at 400–01.

The Court notes as a threshold matter that Plaintiffs rely heavily on the alleged conduct of Kirijan to show that they establish the affirmative act element of their state-created danger claim. As set out above, *see supra* p. 18, the Court assumes *arguendo* that the District could be held liable for Kirijan's alleged conduct.

Here, paragraphs 41, 42, 70, 71, 73, 74, 75, 99, 101, 102, 112, 113, 115, 116, 120, 121, and 131 of Plaintiffs' Amended Complaint each contain allegations solely of a failure to act on the part of the District. Assuming the truth of Plaintiffs' factual allegations, as the Court must, they are insufficient to plausibly allege a state-created danger claim. *See Mears*, 24 F.4th at 884; *see also Burella*, 501 F.3d at 146–47.

Paragraph 41 of Plaintiffs' Amended Complaint in part alleges that:

[...] internal SSD records indicate that the Defendant declined to disconnect two water fountains at Whittier Elementary, claiming that the building used bottled water and therefore no action was necessary. Similarly, even though it was recommended that a kitchen sink at Willard Elementary be disconnected, internal reports reflected that the Defendant took no action on that sink.

(Doc. 35 ¶ 41.)

Paragraph 42 of Plaintiffs' Amended Complaint in part alleges that:

In fact, 10 of the water sources that Guzek recommended the Defendant deactivate in 2016 were still operational in 2018. The Defendant's own records reflect that water sources were not deactivated despite Guzek's directive to disconnect them.

(*Id*. ¶ 42.)

Paragraph 70 of Plaintiffs' Amended Complaint alleges that:

Despite being advised in January 2019 of the hazardous lead test results, having primary responsibility of ensuring the safety of school operations, and being subject to state-mandated reporting requirements, Kirijan took no action to remove, disconnect or remediate those lead-contaminated water sources, or to ensure that the work had been done.

(*Id*. ¶ 70.)

Paragraph 71 of Plaintiffs' Amended Complaint alleges that:

The Defendant not only failed to ensure that any of these contaminated sources were disconnected; they actively concealed[4] the results and failed to warn any student, faculty member, staff member, or parent about those high lead test results.

(*Id.* ¶ 71.)

Paragraph 73 of Plaintiffs' Amended Complaint alleges that:

Maybe no better example of the active concealment by Defendant is the fact that, as part of the criminal investigation, a folder from Kirijan's file cabinet was recovered, which contained a list of topics that Kirijan considered presenting to the SSD School Board Executive Committee on January 26, 2019. One of the topics was the 2018 Guzek lead test results. Included with that list of topics was a folder containing 13 separate copies of the 2018 test results. This number of copies correlated to the number of board members, including board secretary and solicitor, who would be attending the upcoming meeting. Kirijan, however, chose not to disclose the information pertaining to the 2018 test results to any of the board members.

(*Id.* ¶ 73.)

Paragraph 74 of Plaintiffs' Amended Complaint alleges that:

Indeed, it was not until January 2020 that the test results were brought to the attention of the new administration revealing the active concealment[5] of the prior administration, those water sources were immediately disconnected, and the problem was disclosed.

---

[4] Plaintiffs allege no facts to show how Defendant "actively concealed" the results. Therefore, this aspect of paragraph 71 is a conclusory and unsupported assertion that will accordingly be disregarded by the Court. *See Ethypharm*, 707 F.3d at 231 n.14.

[5] Plaintiffs allege no facts to show how there was "active concealment" on the part of the District's previous administration. Therefore, this is a conclusory and unsupported assertion that will accordingly be disregarded by the Court. *See Ethypharm*, 707 F.3d at 231 n.14.

(Doc. 35 ¶ 74.)

Paragraph 75 of Plaintiffs' Amended Complaint alleges that:

Kirijan, whose essential job functions as SSD Superintendent included "school district state required reporting," never forwarded the high lead test results to the Pennsylvania Department of Education, as required by statute.

(*Id.* ¶ 75.)

Paragraph 99 of Plaintiffs' Amended Complaint alleges that:

The Defendant failed to comply with AHERA and, in doing so, placed thousands of students, faculty and staff at risk for asbestos inhalation and its commensurate serious health complications.

(*Id.* ¶ 99.)

Paragraph 101 of Plaintiffs' Amended Complaint alleges that:

Given his district-funded coursework and certification, the Defendant, through its agent Brazil, was fully aware of the hazards of asbestos and how to identify and address those hazards. However, the Defendant disregarded the safeguards designed to ensure that students, staff, and faculty of the Defendant were protected from those hazards.

(*Id.* ¶ 101.)

Paragraph 102 of Plaintiffs' Amended Complaint alleges that:

Specifically, as pictured below, in October 2018, SSD administrators received photos of the deteriorating conditions inside Northeast Intermediate. No one informed the people in the building — or the maintenance workers repairing it — that the walls and ceilings inside could contain asbestos.

(*Id.* ¶ 102.)

Paragraph 112 of Plaintiffs' Amended Complaint alleges that:

Guzek's testing showed that between the 2016 comprehensive inspection and the 2019 comprehensive re-inspection, 15 of the 74 areas containing ACBM became even worse. Additionally, 42 of the 74 areas retained the same urgent "Removal Priority" levels, demonstrating that the SSD had taken no action to remediate those areas.

(Doc. 35 ¶ 112.)

Paragraph 113 of Plaintiffs' Amended Complaint alleges that:

Of the 74 locations originally designated as urgent "Removal Priority" levels, only 7 had confirmed abatement projects completed between 2016 and 2019. Thus, 67 locations identified as urgent "Removal Priority" levels were ignored, continuing to expose students and staff attending the SSD to hazardous asbestos.

(*Id.* ¶ 113.)

Paragraph 115 of Plaintiffs' Amended Complaint alleges that:

In 2016, both Kirijan and Brazil were fully aware of the dangerous asbestos test results warranting immediate remediation. However, neither took the necessary action to remediate those asbestos hazards permeating the buildings in the SSD.

(*Id.* ¶ 115.)

Paragraph 116 of Plaintiffs' Amended Complaint alleges that:

During its 2016-2019 contract with the Defendant, Guzek had direct contact with the Defendant via Brazil regarding its asbestos testing and findings. Throughout that three-year period, Guzek repeatedly communicated with Brazil, about its asbestos findings and the urgent need for remediation at the numerous school in the SSD. With rare exceptions, Brazil failed to address the significant areas of concern.

(*Id.* ¶ 116.)

Paragraph 120 of Plaintiffs' Amended Complaint alleges that:

Apart from the August 23, 2016, meeting, Brazil never made another effort to address any asbestos issues at the SELT meeting again, nor did Kirijan ever add this issue to the SELT meeting agenda. Stated differently, other than that one instance on August 23; 2016, the agenda records do not reflect that the asbestos problems (or lead contamination) were ever raised at the weekly SELT meetings.

(*Id.* ¶ 120.)

Paragraph 121 of Plaintiffs' Amended Complaint alleges that:

During the entire July 2016 to March 2019 time period, Kirijan failed to ensure that the necessary remediation action was taken, thereby continuing to expose students and staff to this environmental danger in their school community.

(Doc. 35 ¶ 121.)

Paragraph 131 of Plaintiffs' Amended Complaint alleges that:

The Defendant failed to implement any of these federal requirements. No such remediation plans were provided, no warnings were given regarding potential asbestos hazards, and no custodial staff were ever briefed on potential asbestos dangers, let alone trained on how to address them.

(*Id.* ¶ 131.)

Each of these paragraphs of the Amended Complaint contain only allegations of a failure to act. They are therefore insufficient to allege a state-created danger claim, *see DeShaney*, 489 U.S. at 200; *Morrow,* 719 F.3d at 178, and warrant no further discussion.

Having set aside Plaintiffs' conclusory allegations, factual allegations that are immaterial for the purpose of making out a state-created danger claim, and allegations of failures to act, *see supra* p. 20 n.3, pp. 24-28, only three alleged bases of support for Plaintiffs' state-created danger claim remain: (1) statements in the 2016 Scranton Times article; (2) alleged concealment of the 2018 lead testing results; and (3) requests for an employee to stop emailing concerns to Kirijan and others in the District. For the reasons discussed below, the conduct alleged fails to provide the requisite support for Plaintiffs' state-created danger claim.

### a. 2016 Scranton Times Article

Plaintiffs allege that Kirijan made statements to the Scranton Times in 2016 that falsely assured Plaintiffs and the class that they were safe. (*See* Doc. 35 ¶¶ 44, 45.)

The Third Circuit addressed whether assurances constitute an affirmative act for the purpose of making out a state-created danger claim in *Mears*, where the plaintiff, the mother of psychiatric patient, was assaulted by her son during a visit with him at the state facility where he resided. 24 F.4th at 883. The Circuit Court affirmed the district court's dismissal of the state-created-danger claim against the doctor who allegedly encouraged the plaintiff to visit her son and said she would be safe, explaining that

> our precedent holds[] assurances and failures to warn are not affirmative acts. In one case, police assured a family that they would arrest a criminal but did not. *Bright*, 443 F.3d at 279. The criminal then murdered a child. *Id.* We held that "expressing an intention" to arrest without doing so was not an affirmative

act. *Id.* at 284. In another case, police failed to warn a witness in a criminal case of the defendant's menacing behavior, even though the defendant was a convicted killer. *Walter v. Pike Cnty.*, 544 F.3d 182, 186–88 (3d Cir. 2008). Yet even if the police were "highly culpable," we held, they could not be liable for failing to warn of private violence. *Id.* at 194. Likewise, we refused to hold a doctor liable for mistakenly assuring a seriously ill patient that he had "nothing to worry about and that he [was] fine." *Ye* [*v. United States*, 484 F.3d 634, 635, 641 (3d Cir. 2007)].

Instead, an affirmative act must amount to a "'restraint of personal liberty' that is 'similar' to incarceration or institutionalization." *Id.* at 640–41 (quoting *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998).

24 F.4th at 884.[6]

The Scranton Times article at issue states that:

Water testing done by the Scranton School District reveals that children are not in any danger, according to the district's superintendent and school board president. The district began testing the water in all of its buildings for lead this spring. Officials decided to hire Guzek Associates of Clarks Summit after news of the water contamination in Flint, Michigan, and questions about the safety of water locally. The district will release those results at a 2 p.m. press conference today. Results will be available at the district's website, scrsd.org, after the announcement. While students were not in any danger, district officials said they will also discuss several remedial measures put in place. For example, a water fountain at West Scranton High School was shut down because of old fittings that resulted in elevated lead levels from that one source, board President Bob Sheridan said.

(Doc. 35 ¶ 44.)

---

[6] *Mears* concluded that the plaintiff plausibly pled a state-created-danger claim against the nurse who was responsible for supervising her visit and left her alone with her son—the nurse was aware of the patient's deteriorating mental health condition and recent violence but, after initially supervising the mother's visit, withdrew her supervision mid-visit and left the mother, who was not permitted to exit the room, alone with her son, creating a situation in which the nurse "assumed care but then withdrew it, leaving [the mother] alone in a more dangerous position." *Mears*, 24 F.4th at 885 (citing *Kneipp*, 95 F.3d at 1209; *Ye v. United States*, 484 F.3d 634, 640, 643 (3d Cir. 2007)).

.

This article can be read, at most, to include an assurance by Kirijan and Sheridan that District children were not in any danger related to lead found in the water in District buildings.[7] *Mears* confirms that this assurance cannot be construed as an affirmative act. Pursuant to Third Circuit precedent, even a mistaken assurance is not an affirmative act. 64 F.4th at 884 (quoting *Ye*, 484 F.3d at 635, 641 (no affirmative act when doctor "mistakenly assur[ed] a seriously ill patient that he had "nothing to worry about and that he [was] fine"). Thus, to the extent there could be error in the assessment that children were not in danger, the assurance in the Scranton Times article does not constitute an affirmative act for purposes of the state-created danger claim.

Other lead-related information contained in the article are factual assertions rather than assurances. For example, statements that the District "began testing the water in all of its buildings for lead this spring," had "hire[d] Guzek Associates of Clarks Summit" for this purpose, and would disclose at the press conference the results of the testing as well as "several remedial measures put in place" (*id*. ¶ 44) express nothing more than what had factually taken place and what was planned for the press conference.

---

[7] Although Plaintiffs imply that assurances related to lead were made at the June 8, 2016, press conference referenced in the article (*see* Doc. 35 ¶ 44, Doc. 44 at 32), Plaintiffs do not identify any specific assurance made at the press conference. Therefore, further discussion of Plaintiffs' allegations related to the press conference is not warranted.

For the foregoing reasons, Plaintiffs' attempt to characterize statements attributed to Kirijan in the article as "intentionally misleading" is without foundation; it is a conclusory assertion not entitled to the presumption of truth. *See Schuchardt, supra* at 347 ("[T]he presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face. [...] Conclusory assertions of fact and legal conclusions are not entitled to the same presumption.") Therefore, Plaintiffs' allegations related to the 2016 Scranton Times article are wholly insufficient to plausibly allege an affirmative act on the part of the District.

### b. "Concealment" of 2018 Test Results

Similarly, Plaintiff's allegation that Kirijan "actively concealed" the 2018 Guzek testing results does not constitute an affirmative act under a state-created danger theory. (*See, e.g.,* Doc. 35 ¶¶ 71, 73, 74.) In pertinent part, Plaintiffs argue in their Brief in Opposition that they adequately allege concealment on the part of the District:

> Despite being advised in January 2019 of the hazardous lead test results, having primary responsibility of ensuring the safety of school operations, and being subject to state-mandated reporting requirements, Kirijan took no action to remove, disconnect or remediate those lead-contaminated water sources, or to ensure that the work had been done. [(Doc. 35 ¶ 70.)]

> The Defendant not only failed to ensure that any of these contaminated sources were disconnected; they actively concealed the results and failed to warn any student, faculty member, staff member, or parent about those high lead test results. *Id.*, ¶ 71.

(Doc. 44 at 33.)

Defendant contends that dismissal is warranted because Plaintiffs' allegations relating to Kirijan's acts pertaining to the 2018 lead testing results present a failure to act rather than an affirmative act. *See DeShaney*, 489 U.S. at 200. Despite Plaintiffs' language referring to Kirijan's conduct in 2019 as "concealment," Plaintiffs' allegation that Kirijan failed to report or disclose Guzek's 2018 lead testing results is in essence a failure to act. (*See* Doc. 44 at 31.) A failure to act does *not* constitute an affirmative act for the purpose of making out a state-created danger claim. *See Johnson*, 975 F.3d at 400–01.

Plaintiffs refer to *D.N. ex rel. Nelson v. Snyder,* 608 F. Supp. 2d 615 (M.D. Pa. 2009), to argue that active concealment of information that increased exposure to harm can satisfy the affirmative act element, but Plaintiffs misstate the findings of that case and their application to the facts found here. (*See* Doc. 44 at 31.) In *D.N. ex rel. Nelson*, Plaintiffs made allegations that Defendants took affirmative steps that increased D.N. and S.N.'s exposure to harm through an elaborate and intentional "cover up" of a former police officer's history of viewing child pornography as the officer was applying to become a foster parent with the Pennsylvania Department of Welfare. *See D.N. ex rel. Nelson*, 608 F. Supp. 2d at 621. Although the district court in *D.N. ex rel. Nelson* found "that the determinative inquiry is not whether conduct is properly characterized as an affirmative act or omission, but whether state action has placed the plaintiff in a foreseeably dangerous position," the court determined that it was the defendant's "affirmative steps" of intentionally covering up the

officer's conduct that constituted an affirmative act. *Id*. at 627. Specifically, the district court there found that the defendants' active suppression of the officer's conduct, destruction of physical evidence of such conduct, and encouragement of other employees to refrain from disclosing the officers conduct that constituted an "affirmative act." *Id*.

Plaintiffs' factual allegations in this case are clearly distinct from the facts alleged in *D.N. ex rel. Nelson*. Here, Plaintiffs accuse Defendant of failing to disclose lead testing results, a failure to act that bears no resemblance to the multi-faceted and active departmental cover up extensively alleged in *D.N. ex rel. Nelson*. Thus, Kirijan's alleged failure to disclose the Guzek test results does not constitute an affirmative act for the purpose of making out a state-created danger claim.

### c. Demand to Stop E-Mailing Concerns

Plaintiffs also reference the allegations contained in their Amended Complaint that Kirijan took steps to "silence" employees from speaking out on various issues as an allegation of an affirmative act. (*See* Doc. 35 ¶¶ 124-126.) Specifically, Plaintiffs state that:

> the FAC alleges that the Superintendent took affirmative steps to silence employees who complained about the conditions. Dkt. 35, ¶¶122-125. In one instance the Superintendent told an employee who repeatedly complained about the conditions, "stop emailing conversations that had previously been discussed and documented by phone."

(Doc. 44 at 31.)

The assertions that Kirijan demanded that an employee stop e-mailing Kirijan and others in the District about building conditions are not alleged to relate to asbestos or lead. (*See* Doc. 35 ¶¶ 124-125.) Rather, the subject of the employee's concern is that "ceilings in several classrooms within his/her building had collapsed . . . [and] plaster and dust from the ceiling fell on the students, their desks and their school books, necessitating that the students be moved to other classrooms for their safety." (Doc. 35 ¶ 124.) Plaintiffs provide no basis to infer that the plaster and dust contain asbestos or lead.  Therefore, Plaintiffs' allegations related to the e-mails cannot constitute an affirmative act with respect to Kirijan's alleged authority in addressing lead or asbestos issues within the District.

In sum, the foregoing analysis shows that Plaintiffs have not plausibly pled that an affirmative act attributable to the District supports their state-created danger claim. Because Plaintiffs' allegations do not satisfy the affirmative act element, they do not plausibly allege a state-created danger claim and dismissal of this claim is warranted. Despite this dispositive determination, the Court will *sua sponte* assess whether Plaintiffs' amended complaint sufficiently alleges that "the state actor acted with a degree of culpability that shocks the conscience." *Bright*, 443 F.3d at 281.

### 2. Conscience-Shocking Behavior

The Court concludes that Plaintiffs' have not pled facts from which it can be inferred that a state actor's conduct related to lead or asbestos "shocks the conscience."[8] *See Bright*, 443 F.3d at 281.

In *Kaucher v. County of Bucks*, the Third Circuit explained its understanding of the conscience shocking standard:

> In *Lewis,* the Supreme Court explained that "the core of the concept" of due process is "protection against arbitrary action," *County of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), and that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense," *id.* at 846, 118 S.Ct. 1708 (quotation omitted). The Court further explained, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847, 118 S.Ct. 1708 (quotation omitted). Accordingly, in a substantive due process challenge to an action taken by an executive branch official, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n. 8, 118 S.Ct. 1708; *see also United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 399–400 (3d Cir.2003) ("[O]ur cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience.").

---

[8] In the Court's July 15, 2022, Memorandum Opinion addressing the motion to dismiss Plaintiffs' Class Action Complaint, the Court addressed the conscience-shocking element in a context which differs from that presented here. (*See* Doc. 33 at 26-29 & n.8 (*O'Donnell v. Scranton School District*, 615 F. Supp. 3d 262, 279-80 & n.8.(M.D. Pa. 2002)).) As discussed in the preceding section of this Memorandum Opinion, Plaintiffs' First Amended Class Action Complaint (Doc. 35) contains additional allegations regarding conduct assumed attributable to Defendant. With these specific allegations, the Court is now in a position to assess whether the conduct alleged could be considered conscience shocking.

455 F.3d at 425.

The appropriate standard to determine whether Defendant's conduct in this case

meets the conscience-shocking requirement is "deliberate indifference." *Kaucher*, 455 F.3d

418 at 426 (3d Cir. 2006); *see also Phillips*, 515 F.3d at 240. In *Kaucher*, the Circuit Court

noted that it had previously expressed approval of the following deliberate indifference

standard: "deliberate indifference . . . require[s] that 'a person consciously disregard a

substantial risk of serious harm.'" 455 F.3d at 427-28 (quoting *Ziccardi v. City of

Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002)). *Kaucher* went on to survey authority related to

what action is conscience shocking, beginning with the observations that "'the measure of

what is conscience shocking is no calibrated yard stick,' *Lewis,* 523 U.S. at 847, 118 S.Ct.

1708, and '[d]eliberate indifference that shocks in one environment may not be so patently

egregious in another,' *id.* at 850, 118 S.Ct. 1708." *Kaucher*, 455 F.3d at 425-26.

In their Amended Complaint, Plaintiffs allege that:

> [t]he Defendant's actions, inactions, and/or deliberate indifference in allowing
> the presence of asbestos and lead in unsafe levels within its Schools for an
> extended period, in failing to inform its students, faculty and staff of the
> presence asbestos and lead in unsafe levels until January 2020, and in failing
> to to [sic] take adequate steps to rectify the asbestos and lead problems until
> January 2020, shocks the conscience.

(Doc. 35 ¶ 145.)

Plaintiffs' factual allegations contained in their Amended Complaint do not constitute

conscience-shocking conduct on the part of Defendant. To the extent Plaintiffs rely on the

2016 Scranton Times article pleaded verbatim in their Amended Complaint (Doc. 35 ¶ 44),

the text of the article does not state or support a claim of deliberate indifference on the part

of the District. As the Court discusses, *supra*, the Scranton Times article states that "[t]he

district will release [the lead testing] results at a 2 p.m. press conference today" and that

"[r]esults will be available at the district's website, scrsd.org, after the announcement." (*Id*.)

In the article, Kirijan and Sheridan are represented to have assured "that children are not in

any danger," rather than to have affirmatively stated that there was no lead or asbestos

present in the District's schools, or that all asbestos or lead issues had been remediated.

(*Id*.) The 2016 Scranton Times article as alleged in Plaintiffs' Amended Complaint does not

provide factual support for Plaintiffs' allegation that Defendant was deliberately indifferent.

Additionally, to the extent Plaintiffs rely on Kirijan's alleged e-mails to a District

employee requesting that employee to "stop e-mailing conversations that had previously

been discussed and documented by phone" (*id*. ¶ 125), for the reasons discussed

previously, *see supra* p. 35, no alleged facts support Plaintiffs' assumption that Kirijan's

communications related to the lead or asbestos concerns in the District. Therefore,

allegations related to the e-mails cannot be conscience-shocking conduct related to lead

and asbestos.

Finally, Plaintiffs' allegations that Kirijan failed to address the ongoing lead and

asbestos concerns within the District are an insufficient basis to find conscience shocking

conduct. In their Amended Complaint, Plaintiffs allege that Kirijan failed to respond to and remediate ongoing lead and asbestos problems in buildings throughout the District. (*See, e.g.*, Doc. 35 ¶¶ 43, 45, 67, 70, 71, 72, 73, 113, 120, 121.) Plaintiffs' allegations that Kirijan failed to address the lead and asbestos issues within a four-year timeframe do not rise to the level of conscience-shocking behavior. *See Kaucher*, 455 F.3d at 427-28. Instead, the allegations made in Plaintiffs' Amended Complaint present a showing that the District was in fact attempting to address the lead and asbestos issues in its schools. (*See, e.g.*, *id.* ¶¶ 36, 37, 41, 44, 55, 73, 100, 105, 106.) The District had lead and asbestos testing completed across the District twice in a four year period. (*See id.* ¶¶ 37, 42, 105,106.) In the 2016 Scranton Times story, the District announced that it planned to communicate the 2016 lead testing results publicly to those in the community. (*See id.* ¶ 44.) The District took acts to remediate at least some sources of lead and asbestos in various buildings from 2016 to 2019. (*See id.* ¶¶ 64, 112, 113.) The paragraphs identified above indicate that, viewing Plaintiffs' factual allegations in the light most favorable to them, as the Court must, Plaintiffs fail to plausibly allege conscience-shocking behavior on the part of the District as it relates to lead and asbestos concerns. *See Kaucher*, 455 F.3d at 426.

Thus, in addition to the factual insufficiency of Plaintiffs' First Amended Class Action Complaint (Doc. 35) on the affirmative act element of their state-created danger claim, the pleading is also insufficient as to the conscience-shocking element of the claim. Because

Plaintiffs have not provided adequate factual support for two elements of their state-created

danger claim, they have not alleged "enough facts to state a claim to relief that is plausible

on its face."[9] *Twombly*, 550 U.S. at 570.  Therefore, Plaintiffs' state-created danger claim is

properly dismissed.

## B. Substantive Due Process Bodily-Integrity Claim

Plaintiffs concede that their "bodily integrity claim is subsumed by the state created

danger claim." (Doc. 44 at 26 n.3.) Therefore, the Court's analysis with respect to this claim

remains consistent with the analysis disposing of Plaintiffs' state-created danger claim.

Plaintiffs' substantive due process bodily-integrity claim will also be dismissed.

## C. Medical Monitoring Claim

"[28 U.S.C.] § 1367(c)(3) expressly permits the district court to decline supplemental

jurisdiction in the event, as is the case here, the federal claims are resolved." *Lewis v. DMH*

*Invs., LLC*, No. 23-1446, 2023 WL 3862507, at *2 (3d Cir. June 7, 2023). Having dismissed

Plaintiffs' state-created danger and substantive due process bodily integrity claims, the

Court declines to exercise supplemental jurisdiction over Plaintiffs' state common law

medical monitoring claim. The issue of whether immunity under the Political Subdivision

Torts Claim Act bars Plaintiffs' medical monitoring claim is also one of Pennsylvania law,

---

[9] Since Plaintiffs fail to adequately plead the affirmative act and conscience-shocking elements of a state-created danger claim, there is no need to address the remaining two elements. The Court would likely find, however, that Plaintiffs adequately plead that they were foreseeable victims of Defendant's alleged conduct, the third element of a state-created danger claim.

and the Court will decline to exercise supplemental jurisdiction over the applicability of this

defense as well. Therefore, rather than dismissing the medical monitoring claim with

prejudice as requested Defendant, the Court will dismiss Plaintiffs' common law medical

monitoring claim without prejudice to allow Plaintiffs to bring their medical monitoring claim

in state court.

## V. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss the Amended

Complaint (Doc. 40) will be granted. Plaintiffs' state-created danger claim (Count I) and

substantive due process bodily integrity claim (Count II) will be dismissed with prejudice

based on the Court's determination that granting leave to amend for a second time would be

futile. The Court will dismiss Plaintiffs' medical monitoring claim (Count III) without prejudice

to allow Plaintiffs to bring that claim in state court. A separate Order will follow.

_____
Robert D. Mariani
United States District Judge